**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the**



FILED

Dec 12 2014, 9:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARCE GONZALEZ, JR.**
Dyer, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEREMY K. BLUE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1404-CR-113 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Clarence D. Murray, Judge
Cause No. 45G02-1203-MR-1

**December 12, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Jeremy Blue appeals his convictions and sentence for murder and Class B felony robbery. We affirm.

**Issues**

The issues before us are:

I.      whether the trial court properly instructed the jury regarding Blue's presumption of innocence; and

II.     whether Blue's aggregate sentence of eighty years is inappropriate.

**Facts**

The evidence most favorable to the convictions is that, in February 2012, Blue asked a friend, Arie Brown, if he could use Brown's gun to "hit a lick," which is slang for committing a robbery. Tr. p. 296. Brown refused to lend Blue his gun. On March 3, 2012, Blue approached another friend, Donvell Edwards, asking about acquiring a gun to "hit a lick." Id. at 850. Edwards understood that Blue wanted to rob a Lucky Mart convenience store in Merrillville. Edwards introduced Blue to Edward Perry to talk about obtaining a gun from Perry.

On March 4, 2012, Blue called Edwards, and Blue, Edwards, and Perry met to discuss robbing the Lucky Mart. Edwards had previously been convicted of robbing the same Lucky Mart and gave Blue information about the store, including the fact that it had a hidden safe and surveillance cameras. Blue then drove with Edwards and Perry to an apartment complex near the Lucky Mart. Blue was driving his tan Oldsmobile with a distinctive burgundy- or red-colored hood. Perry gave a gun to Edwards, who then gave

2

it to Blue with the safety on, telling Blue, "don't hurt nobody, just be cool . . . ." Id. at 877. Edwards also gave Blue a hockey goalie mask to wear.

Blue then went into the Lucky Mart, where Judi Simpson-Beaver was working by herself at the time. Blue pulled the gun on Simpson-Beaver and demanded, "b****, give me the money." Id. at 629. Simpson-Beaver gave Blue two cash drawers. Despite Blue's wearing the mask, Simpson-Beaver recognized him from the neighborhood and said, "Jeremy, why are you doing this?" Id. at 909. Blue then decided that he had to kill Simpson-Beaver, and he shot her twice, once in the chest and once in the face. Simpson-Beaver died in the store from her wounds. Blue ran with the two cash drawers back to his car. While running to the car, Blue partially lifted the hockey mask from his face. Tyshawn Kidd, who was acquainted with Blue and was walking outside the Lucky Mart, saw Blue and recognized him as he went by carrying the cash drawers. Several witnesses also recalled seeing Blue's tan Oldsmobile with a burgundy or reddish hood parked at the apartment complex at the time of the robbery. Blue, Edwards, and Perry then drove away.

Police obtained the surveillance footage from the Lucky Mart and parts of it were broadcast on the news. Two persons acquainted with Blue called police to tell them that they believed Blue was the person who committed the robbery, based on body type and clothing. One of the tipsters also said that Blue had a unique way of walking that she recognized on the surveillance tape.

The State originally charged Blue with murder, felony murder, and Class A felony robbery. It later amended the information to charge Blue with Class B felony instead of

3

Class A felony robbery.  At Blue's jury trial, which was held on November 4-15, 2013,

Blue tendered the following jury instruction:

> Under the law of this state, a person charged with a crime is presumed to be innocent.  This presumption continues in favor of the accused throughout the trial of this cause.  To overcome the presumption of innocence, the [S]tate must prove the Defendant guilty of each essential element of the crime charged, beyond a reasonable doubt.
>
> The Defendant is not required to present any evidence to prove his/her innocence or to prove or explain anything.
>
> You should attempt to fit the evidence to the presumption that the Defendant is innocent.  If the evidence in this case is susceptible of two (2) constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the Defendant, and the other to his/her innocence, it is your duty, under the law to adopt that interpretation which is consistent with the Defendant's innocence, and reject that which points to his/her guilt.

Id. at 1228.  The trial court rejected the instruction, stating:

> Courts are very, very, very reluctant to alter pattern instructions unless there's some compelling reason to do so, and that's getting on a very slippery slope to do that.  And I'm not comfortable in giving that instruction.  I think it's adequately [sic]under the patterns that we have.  So I'm going to reject this.

Id. at 1109.

Edwards and Perry testified against Blue.  Perry received use immunity in exchange for his testimony.  Edwards, who was charged with the same crimes as Blue, pled guilty prior to testifying to Class B felony robbery with a sentencing cap of twelve years.  At the conclusion of trial, the jury found Blue guilty of all three counts.  The trial court entered judgments of conviction only for murder and Class B felony robbery.  It

4

sentenced Blue to a term of sixty-three years for murder and seventeen years for robbery, to be served consecutively for a total term of eighty years. Blue now appeals.

## Analysis

### *I. Jury Instruction*

Blue first challenges the trial court's refusal to give his tendered instruction regarding his presumption of innocence. When reviewing a trial court's decision to give or refuse to give a proposed instruction, we consider: (1) whether the instruction correctly states the law; (2) whether there was evidence presented at trial that would support giving the instruction; and (3) whether the substance of the instruction was covered by other given instructions. Kane v. State, 976 N.E.2d 1228, 1230-31 (Ind. 2012). "Jury instructions should inform the jury regarding the law applicable to the facts without being misleading and should enable the jury to understand the case and arrive at a just, fair, and correct verdict." Filice v. State, 886 N.E.2d 24, 37 (Ind. Ct. App. 2008), trans. denied. When reviewing a claim of instructional error, we must consider the effect of the error in light of the jury instructions as a whole. Inman v. State, 4 N.E.3d 190, 200 (Ind. 2014). Any error in instructing the jury is harmless in a criminal case if a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise. Id. We will reverse if we cannot say with complete confidence that the jury would have found the defendant guilty if it had been properly instructed. Id.

Blue argues that his tendered instruction is identical to Indiana Pattern Instruction (Criminal) 1.13. In fact, they are not precisely identical. That pattern instruction reads:

5

> Under the law of this State, a person charged with a crime is presumed to be innocent. To overcome the presumption of innocence, the State must prove the Defendant guilty of each element of the crime charged, beyond a reasonable doubt.
>
> The Defendant is not required to present any evidence to prove his innocence or to prove or explain anything. [You should reconcile the evidence on the theory that the defendant is innocent if you can do so.] [or] [You should fit the evidence to the presumption that the defendant is innocent if you can do so.]

Ind. Pattern Instruction (Criminal) 1.13 (2014) (brackets in original). The comments to this instruction state that the bracketed language can instead be included as part of Pattern Instruction (Criminal) 1.17, which addresses the credibility of witnesses and the weighing of evidence.

The comments also state that the bracketed language was added to the pattern instructions in response to this court's decision in Lee v. State, 964 N.E.2d 859 (Ind. Ct. App. 2012), trans. denied. In that case, the defendant tendered an instruction identical to the one tendered by Blue, which the trial court refused to give. On appeal, the State argued that the substance of the defendant's tendered instruction was covered by other given instructions, including the following:

> You should keep an open mind. You should not form or express any conclusion or judgment about the outcome of the case until the Court submits the case to you for your deliberations.
>
> * * * * * *
>
> Under the law of this State, a person charged with a crime is presumed to be innocent. To overcome the presumption of innocence, the State must prove the defendant guilty of each element of the crime charged, beyond a reasonable doubt.

6

> The defendant is not required to present any evidence to prove his innocence or to prove or explain anything.

Lee, 964 N.E.2d at 864. The trial court in Lee also instructed the jury that all of the instructions had to be considered together, that the jury must give the defendant the benefit of any reasonable doubt, that it must find the defendant not guilty if the State failed to prove each element of the crime beyond a reasonable doubt, and that if there was conflicting evidence, it was the role of the jury to decide what testimony to believe and what testimony not to believe. Id.

We held that the instructions cited by the State were insufficient to instruct the jury on the defendant's presumption of innocence. Id. at 865. We relied upon our supreme court's holding in Robey v. State, 454 N.E.2d 1221, 1222 (Ind. 1983), where it stated, "An instruction . . . which advises the jury that the presumption of innocence prevails until the close of the trial, and that it is the duty of the jury to reconcile the evidence upon the theory of the defendant's innocence if they could do so, must be given if requested." In particular, we concluded that the instructions cited by the State did not adequately explain "the jury's duty to 'reconcile the evidence upon the theory of the defendant's innocence if they could do so.'" Id. We reversed the defendant's convictions. Id. We did not address whether the defendant was prejudiced by the failure to give his tendered instruction because the State did not argue lack of prejudice.

Here, unlike in Lee, the trial court did give an instruction, tracking Pattern Instruction (Criminal) 1.17, which stated in part, "You should attempt to fit the evidence to the presumption that the defendant is innocent and the theory that every witness is

7

telling the truth." App. p. 169 (emphasis added). We have held that this instructional language satisfies the requirements of the <u>Lee</u> and <u>Robey</u> opinions and is adequate to inform the jury of the defendant's presumption of innocence. <u>Smith v. State</u>, 981 N.E.2d 1262, 1269 (Ind. Ct. App. 2013) (citing <u>Simpson v. State</u>, 915 N.E.2d 511 (Ind. Ct. App. 2009), <u>trans. denied</u>), <u>trans. denied</u>. As such, we conclude the substance of Blue's tendered instruction was covered by other given instructions, and the trial court did not abuse its discretion in refusing to give that instruction.[1] <u>See</u> <u>id.</u>

Moreover, unlike in <u>Lee</u>, the State does argue here that Blue could not have been prejudiced by the trial court's refusal to give his tendered instruction. The evidence against Blue was overwhelming. Blue makes much of the fact that the two primary witnesses against him were his cohorts in the robbery, Edwards and Perry, and that they received beneficial prosecutorial treatment in exchange for their testimony. The fact remains that there was absolutely no evidence presented to suggest that anyone other than Blue walked into the Lucky Mart, shot and killed Simpson-Beaver, and absconded with two cash drawers. In addition to Edwards and Perry, Kidd also positively identified Blue as the person he saw walking from the Lucky Mart wearing a hockey goalie mask and carrying two cash drawers; two other witnesses believed Blue was the person seen on the surveillance tape; and multiple witnesses saw Blue's distinctively-colored Oldsmobile parked at the apartment complex near the Lucky Mart at the time of the robbery. We conclude that, even if the jury could have been more thoroughly instructed regarding its

---

[1] To the extent Blue separately argues that the jury was not adequately informed that his presumption of innocence was to be maintained throughout trial, we observe that the <u>Lee</u> opinion expressed no concern that the other instructions given in that case, which were similar to other instructions given here, were inadequate on that point.

8

duty to weigh conflicting evidence in a light most favorable to Blue's presumption of innocence, there simply was no such conflicting evidence. All of the evidence pointed to Blue's guilt. Blue has not established that he was prejudiced by the manner in which the trial court instructed the jury.

## *II. Sentencing*

Next, Blue contends that his aggregate eighty-year sentence is inappropriate under Indiana Appellate Rule 7(B) in light of his character and the nature of the offenses. Although Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, we still must give due consideration to that decision. Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. Id. "Additionally, a defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." Id.

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest— the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." Id. Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case. Id. at 1224. When reviewing the appropriateness of a sentence under Rule 7(B),

9

we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended. Davidson v. State, 926 N.E.2d 1023, 1025 (Ind. 2010).

Regarding the nature of the offenses, Blue planned to commit a robbery for a period of time, moving forward with his plan after Brown refused to give him a gun and finding another person who would provide him with one. Blue then committed the robbery of the Lucky Mart and shot and killed Simpson-Beaver in cold blood when she indicated that she knew him. In fact, the surveillance tape shows Blue going back to shoot Simpson-Beaver a second time, directly in the face, after he had already shot her in the chest and he was starting to leave the store. This senseless killing was egregious.

As for Blue's character, he notes that he was only twenty years old (nearly twenty-one) at the time of the crimes. That is not an especially youthful age for purposes of sentencing though, especially where, as here, a defendant is "more 'hardened and purposeful' than 'clueless.'" Coleman v. State, 952 N.E.2d 377, 385 (Ind. Ct. App. 2011) (quoting Ellis v. State, 736 N.E.2d 731, 736 (Ind. 2000)). Blue has juvenile adjudications for Class A misdemeanor criminal mischief, Class C misdemeanor minor consumption of alcohol, two counts of Class D felony receiving stolen property, and one count of misdemeanor receiving stolen property in California. Blue failed juvenile probation on one occasion. He has an adult conviction for Class A misdemeanor possession of marijuana. He also admitted to using marijuana heavily since the age of eleven. While awaiting trial in the present case, Blue received numerous misconduct reports, including for fighting and throwing feces and urine on other inmates, which ultimately led to his

10

segregation in the jail. While this other, documented criminal misconduct of Blue is not nearly as severe as his murder of Simpson-Beaver, it is clearly reflective of an individual who "has been regularly flouting the law, whether in jail or prison or outside of them, for many years." See id.

The trial court here also noted that Blue was "defiant" during the sentencing hearing and made a "lame effort in apology" to Simpson-Beaver's family. Tr. p. 1284. Indeed, during Blue's allocution, while purporting to apologize for Simpson-Beaver's death while maintaining his innocence, he accused the prosecutors of lying and told Simpson-Beaver's family, "I know you probably don't understand that . . . you're not the only person that is really suffering" and suggesting he would suffer from incarceration. Id. at 1280. Additionally, Blue wrote a letter to the prosecutor's office after trial and before sentencing in which he said in part that "the masked man was inraged [sic]" by Simpson-Beaver supposedly not cooperating during the robbery and further stating, "I cannot plead guilty to Robbery because the robber was the one being robbed. I have a son at home & honestly looking at both sides he's the real victim in this case . . . ." App. p. 135. Blue's complete lack of empathy towards Simpson-Beaver and her family, as well as his "woe-is-me" self-centeredness, is disturbing. Although a defendant's decision to maintain his or her innocence is not a proper sentencing consideration, a lack of remorse and disdain for the system may be. Deane v. State, 759 N.E.2d 201, 205 (Ind. 2001). Such is the case here. Blue's character is poor.

Blue also asserts that his mental health warrants a reduction of his sentence. Deciding whether a defendant's mental health problems are entitled to consideration in

11

sentencing requires "a high level of discernment" by courts. Covington v. State, 842 N.E.2d 345, 349 (Ind. 2006). Factors to consider include "the extent of the inability to control behavior, the overall limit on function, the duration of the illness, and the nexus between the illness and the crime." Id. Here, Blue relies primarily upon a psychological evaluation performed upon him in 2006 through a juvenile court order. The psychologist noted that Blue was of average intelligence but was delayed in processing thoughts and responding to questions; the psychologist thought this delay "may be related to the thought disorder, mood disorder, neurological or medical problem or the influence of a 'drug-induced' type of thought disorder." Sentencing Ex. 5 p. 4. Ultimately, however, the psychologist opined that Blue's "legal problems stem from situational factors rather than internal or long-term psychological disorders." Id. at 7. We do not believe that this report, which was over seven years old at the time of Blue's sentencing, demonstrates any nexus between his mental health and the crimes he committed. There was no more recent expert evidence presented at the sentencing hearing regarding Blue's mental health. Similarly, to the extent Blue contends he had a troubled childhood, "[o]ur supreme court has 'consistently held that evidence of a difficult childhood warrants little, if any, mitigating weight.'" Patterson v. State, 909 N.E.2d 1058, 1062 (Ind. Ct. App. 2009).

Finally, we address Blue's claim that his sentence is excessive in comparison with the State's treatment of his cohorts, Edwards and Perry. In some cases, we may revise a sentence when there is a "stark" contrast between sentences imposed on a defendant and his or her co-defendants, especially when the defendant's culpability is equal to or less than a co-defendant who received a considerably lesser sentence. See Coleman, 952

12

N.E.2d at 385-86 (citing Cardwell, 895 N.E.2d at 1226). Here, the State dismissed the murder and felony murder charges against Edwards and offered a plea agreement to Class B felony robbery, with a sentencing cap of twelve years. As for Perry, the record indicates he was granted "use immunity" for his testimony. Ex. 150. Although Blue seems to contend the State granted Perry absolute immunity from any prosecution connected with the robbery of the Lucky Mart, use immunity only "prohibits use at a subsequent criminal proceeding of testimony compelled of the witness." Wilson v. State, 988 N.E.2d 1211, 1219 (Ind. Ct. App. 2013). "Transactional immunity" by contrast is a prohibition against prosecution for any transaction concerning that to which the witness testifies. Id. Perry was not granted that kind of immunity. There is no evidence Perry had in fact been charged with any crimes related to the Lucky Mart robbery at the time of Blue's trial; he was in prison on an unrelated gun charge at the time. However, it does not appear that the use immunity agreement would prohibit such charges.

In any event, we believe there is ample justification in the record for treating Blue much more harshly than Edwards and Perry. Blue was the instigator and driver of the plot to rob the Lucky Mart. He actively sought to obtain a gun for that purpose for several weeks. Blue made a phone call to Edwards on March 4, 2012, to carry the plan into action. Blue was the only one of the three who actually went into the Lucky Mart and, of course, he was the only one who shot Simpson-Beaver. Edwards and Perry did not think Blue was actually going to shoot anyone during the robbery. In fact, Edwards activated the safety on the gun before giving it to Blue and told him not to hurt anyone. At trial, Edwards expressed unequivocal great remorse for what had happened to

13

Simpson-Beaver, unlike Blue's own highly equivocal expression of remorse that seemed to place the blame for the shooting on the victim. Certainly, there are sound policy reasons for the felony murder rule, and it is possible the State could have sought such a conviction against Edwards and Perry if it wanted to do so, despite their lack of mens rea with respect to Simpson-Beaver's shooting. Still, there is no denying for purposes of sentencing that there is abundant evidence of Blue's much greater culpability for both the robbery and the murder. Also unlike Blue, Edwards and Perry cooperated with law enforcement and prosecutors, which cannot be ignored. We do not believe that any reduction of Blue's eighty-year sentence is warranted to bring it closer to Edwards's twelve-year sentence or the granting of use immunity to Perry.

## Conclusion

The trial court did not abuse its discretion in instructing the jury; even if it had, any such error was not prejudicial to Blue. Also, Blue's eighty-year sentence is not inappropriate. We affirm.

Affirmed.

BRADFORD, J., and BROWN, J., concur.

14